IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| AMIT JAIPURIA, PRADEEP JAIPURIA | ' | |
| | ' | Civil Action No. 6:11-cv-00066 |
| Plaintiffs, | ' | |
| | ' | |
| v. | ' | Judge: Leonard Davis |
| | ' | |
| LINKEDIN CORPORATION, WHODOYOUKNOWAT LLC | ' | |
| | ' | Jury Trial Demanded |
| Defendants | ' | |
| | ' | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT LINKEDIN CORPORATION'S
<u>MOTION TO TRANSFER VENUE</u>**

The Court should deny LinkedIn's motion to transfer because it is based entirely on the unsupported assertion that WhoDoYouKnowAt LLC ("WDYKA") is not a "real" defendant, and thus can be simply ignored. WDYKA is a real company with a real infringing product – more than twenty screen shots from the working version are attached as Exhibit A. It is not going bankrupt or out of business, but is currently stalled due to a lack of funding with clear plans to launch another (improved) product in the same space. Its past work in India is of unique concern to plaintiffs, both of whom reside in India, and spent years seeking to commercialize aspects of their patented technology in India. LinkedIn cites no support for its argument that the Court may simply disregard WDYKA, in order to transfer this case, and there is none.

This case cannot be transferred because WDYKA is not subject to suit in the Northern District of California. LinkedIn does not even mention, much less meet, the three-pronged test for establishing specific personal jurisdiction over WDYKA, which is a Texas company that had 2,000 to 3,000 users and no material contacts in California. Indeed, WDYKA's CEO testified that only one or two users in California ever registered, both were just friends of his, neither paid for access, and there is no evidence that either person lives in the Northern District of California. WDYKA's product was not a publicly available interactive website, like LinkedIn, but rather "only people that you gave access to could use it," and there is no evidence a single person in the Northern District of California ever used it. Ex. C, Deposition of L. Blaylock, at 32:23-24.

Even if LinkedIn had shown that WDYKA can be sued in the Northern District of California – it did not – LinkedIn still failed to demonstrate that the Northern District of California is a clearly more convenient forum for WDYKA. Indeed, LinkedIn's motion barely addresses the question. The Court should deny LinkedIn's motion.

**BACKGROUND**

This is an action for patent infringement against two companies that offer logically related and complimentary solutions, each of which infringe the plaintiffs' patents related to an

apparatus and methods for optimizing professional networking. The plaintiff, Amit Jaipuria, with the assistance of Pradeep Jaipuria, conceived of and filed for two patents after attending Carnegie Mellon University – years before companies like LinkedIn and WDYKA formed. The plaintiffs reside in India, and founded, among other things, GizaNetwork and GizaPage, as a product and later application suite related to professional networking/community management.

WDYKA is a real company, with a real product that was offered for sale until it was removed from the marketplace shortly after this lawsuit was filed. It is not going bankrupt or out of business, but is at most stalled due to a lack of funding. Ex. C, at 14-15. It took down its advertising website shortly after this lawsuit was filed, but has clear plans to launch an improved product of the same type soon – a story nearly every .com startup in America has shared, including LinkedIn. And its work in India presents a unique concern to the plaintiffs here.

    A.        **WhoDoYouKnowAt's History is Not Unlike LinkedIn's.**

LinkedIn was launched in 2003, to relatively little fanfare. In a then-good economy, it raised less than $5 million in financing and "grew at a glacial pace," attracting a modest number of users numbering in the thousands. As one early LinkedIn Executive puts it:

> The team was always confident. [But] there wasn't much investor interest in it. [LinkedIn] did 26 VP pitches early. Basically, two VCs offered to lead…. nobody else wanted to invest at the time. People were "willing to follow," but that doesn't really count.

Ex. D, An Oral History of LinkedIn, at 2.[1] In its first three years, "[the] company had no revenue," "[n]o one really had any confidence with how the company was going to make money," and it employed "about 50 people." *Id.* After improving its product with additional code several times, and obtaining several new rounds of financing, LinkedIn finally became profitable – in 2010, <u>seven years after forming</u>. As LinkedIn recently explained: Companies that become successful "don't always look that way in the first couple of years." *Id*. at 2.

---

[1] All Exhibits referenced herein are attached to the Declaration of Lexie White.

1610776v1/012151         2

WDYKA formed later, in 2008, also to little fanfare.  In a then-bad economy, it managed to raise a surprising $1.2 million from more than 20 investors.  *See* Ex. C, Dep. of WDYKA CEO, Lee Blaylock, at 6:21-22; Ex. B, SEC Form D.  In the first two years, WDYKA attracted between 2,000-3,000 users.  Ex. C, Blaylock dep, at 18:20-25.  WDYKA also ran out of financing after several years, in late 2010.  *Id.* at 41:10-13.  It is currently seeking more funding, with plans to improve its product with new code, and re-launch.  *Id*. at 13:15-15:9.  The improved product will operate in the same space as the patents-in-suit, helping companies to optimize their networking capability, with a more focused emphasis on generating leads.  *Id*.

The WDYKA website was changed literally days after LinkedIn filed its Motion to Transfer Venue (which attaches, at Exh. D, a screen print suggesting the website is non-functioning).  The site currently says a new product in the same space is "**COMING SOON**":



See www.whodoyouknowat.com (accessed 7/10/11); *compare with* Ex. D to LinkedIn Motion (attached to LinkedIn's Decl. of Kathryn Robinson).

WDYKA's CEO, Lee Blaylock, confirmed the company is "trying to launch something" and hence posted this message to the site.  Ex. C, Blaylock dep. at 33:15-17.

### B.   WDYKA's Products Were Removed After this Lawsuit was Filed.

Contrary to LinkedIn's assertions, at the time this lawsuit was filed WDYKA offered a real product for sale, marketed under the name "WhoAt" to selected customers who requested and were granted access.  Ex. C, Blaylock dep. at 23:11-13.  The website advertising the WhoAt

product was taken down shortly after service of process for this lawsuit was effected. Ex. E (website traffic report showing approx. 180 unique WDYKA visitors in March 2011). The flowchart in Ex. S was created to illustrate how WhoAt works. More than twenty screen prints showing the WhoAt product in operation are in Exhibit A to this response.

**C.      WDYKA Has No Material Contacts with the Northern District of California.**

WDYKA's 2,000-3,000 registered users were concentrated in Texas, as nearly all of its publicity and direct marketing was centered in the Dallas area. See Ex. F, "35 local companies landed $246.4 million during 2009's third quarter," Dallas Bus. Journal. Indeed, every customer case study WDYKA featured were for Texas companies, including a software company that implemented WDYKA to achieve "800% ROI [return on investment]" for over $35,000.00 in sales. Ex. G, WDYKA Whitepaper.

The screenshots from the WhoAt product in Ex. A depict a networking system eerily similar to LinkedIn, with several important differences. First, WDYKA's product was designed to be more private than LinkedIn. See Ex. H, "WhoDoYouKnowAt: A more exclusive, private LinkedIn." As CEO Lee Blaylock testified, "we were not an open web site." Ex. C, at 13:19. Second, while LinkedIn was designed for individuals, and thus has millions of users, WDYKA was designed for companies. *Id*. at 13:20-21 ("it was more oriented towards helping companies network, not helping an individual."). Third, while LinkedIn was publicly available, WDYKA was available only to those that WDYKA specifically provided with access. Ex. C, at 16:1-14. WDYKA provided access to its product via a user-specific access code that it sent via email. *Id.* Users could run the product under one of four service plans, including a free trial period and three levels of paid access ranging from $9.99-39.99 a month. *Id*. at 19:1-11.

Significantly, for purposes of this motion, WhoDoYouKnowAt did <u>not</u> target residents of California to expand its user base, and in fact had <u>zero paying customers in California</u>. *Id.* at 19:12-14. The CEO and FRCP 30(b)(6) corporate representative of WDYKA testified he was

familiar with the users of WhoAt, and only one or two people in California – both of whom were simply "some friends of" his – ever used the site. Neither paid for access. *Id.* at 18:16-19. WDYKA never advertised in California publications, never targeted California residents to promote its product, never maintained an office in California, had no employees in California, had no business customers – not one company – in California, was not registered with the Secretary of State to do business in California, does not maintain an agent for service of process in California, and has no advertising contracts with businesses in California. *Id.* at 19:19-24, 20:1-5, 9-11, 20:22-25, 23:1-10, Ex. T. Likely based on this, the CEO of WDYKA testified that he would be "shocked" to learn he could be sued in a California court. *Id.* at 22:24-23:2.

By contrast, WDYKA's activities in Texas are substantial. WDYKA maintains its principal place of business in Texas, with offices – still open – in Dallas. *Id*. at 5:1-3. Its CEO and former employees are spread across Texas, including in Dallas, Austin and Houston. *Id.* at 25-27, 31. Its former Chief Operating Officer and Lead Development Architect, Leon Campise, lives in this District. *Id*. at 25:14-26:21. Articles promoting the WhoAt product were centralized in Texas, including the Dallas Business Journal, "Thrillist Dallas," and Dallas-area business conferences. See Exs. F and I. WDYKA was actively attempting to do a deal with an Austin-based company until the third quarter of 2010. Ex. C, Blaylock dep., at 30:18-22. The firm, ReachForce, that housed the WDYKA servers and was (until a few months ago) pursuing joint marketing efforts to raise capital, is based in Austin, Texas. *Id*. at 29:22-30:8; 31:5-11.

      **D.**      **WDYKA's Work in India is of Unique Concern for Plaintiffs.**

Aside from Texas, the activities of WDYKA took place in India. WDYKA outsourced its technical work to the India-based firm, NIIT Technologies. Ex. J, Wall Street Journal article; Ex. K, Blaylock interview; Ex. C, Blaylock dep., at 34:17-23. Blaylock's work with NIIT was featured in the Wall Street Journal and in interviews explaining that he "outsourced development of the application logic extensively to India." Ex. K, at 1. This fact is significant to plaintiffs,

who are residents of India, and who spent years seeking to promote their own India-based company – GizaNetwork Pvt. Ltd. – to commercialize aspects of their patented technology.[2] Plaintiffs' efforts to do so were thwarted by competitors, such as LinkedIn, who are known (by Indian investors) to practice similar technology. Ex. M, email from Alok Mittal. WDYKA, while still early stage, attracted attention as a "private" alternative to LinkedIn. Ex. H. Its use of India-based firms to engineer its product and gain awareness is of unique concern to plaintiffs.

### E. LinkedIn Cannot Ignore WDYKA to Meet its Burden on Transfer.

Contrary to LinkedIn's suggestion, plaintiffs are not restricted to enforcing their patents against companies like LinkedIn, which make millions of dollars every year by using the patented technology. Plaintiffs need not obtain any past damages from WDYKA in order to prove that the WhoAt product infringes their patents and cannot be released in similar fashion in the future absent a license, which may obviously take the form of a running royalty on future sales and/or other business accommodations. Perhaps for this reason, LinkedIn cites no case law – not one case – supporting its assertion that this Court can simply ignore WDYKA. For the reasons set forth below, LinkedIn has failed in its burden as movant seeking to transfer venue – both because it has failed to show that WDYKA is subject to personal jurisdiction in the N.D. Cal. and, separately, because it has ignored and therefore failed to demonstrate that the Northern District of California is clearly more convenient to WDYKA and its witnesses.

### ARGUMENT

### I. LinkedIn Has Failed to Show this Action Could Have Been Brought in the N.D. Cal.

LinkedIn acknowledges that unless the transferee court is a proper venue, this Court cannot even consider whether it would be more convenient. LinkedIn Motion, at 5 (citing *In re*

---

[2] As a side note, the US-based employees of NIIT Technologies, who identify themselves as having worked on the WDYKA product, claim to also reside in the Dallas/Fort Worth area. Ex. L, profile for Gaurav Khandelwal, who identifies himself as a software engineer for WDYKA and an employee of NIIT Technologies, residing in Dallas, Texas.

*Volkswagon AG ("Volkswagon I")*, 371 F.3d 201, 201 (5th Cir. 2004). Yet, LinkedIn gives short shrift to demonstrating that the Northern District of California is a proper venue with respect to WDYKA, a Texas company with no material contacts anywhere in California.

To show that WDYKA can be sued in N.D. Cal., LinkedIn says only that WDYKA operated an "interactive" website that could have been accessed from there and it filled out a company profile on Facebook and LinkedIn (as did 750,000,000 users of Facebook and 100,000,000 users of LinkedIn). *Id*. at 6. The US Supreme Court has cautioned that "traditional jurisdictional analyses are not upended simply because a case involves technological developments that make it easier for parties to reach across state lines." *Boschetto v. Hansing*, 539 F.3d 1011, 1018 (9th Cir. 2008) (citing *WWV v. Woodson*, 444 U.S. 286, 293 (1980)).

The Ninth Circuit, whose law dictates whether the Northern District of California will exercise jurisdiction over WDYKA, employs a three part test to determine whether there is specific jurisdiction over a defendant: the defendant must have (1) "performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006). "If <u>any</u> of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Id*. LinkedIn fails to mention – much less meet – <u>any</u> element of this test.

*First*, WDYKA has not purposefully availed itself of the privilege of conducting activities in the N.D. Cal. The Ninth Circuit has clarified that "in order to satisfy the first prong of the 'minimum contacts' test," LinkedIn must establish "either that [WDYKA] purposefully availed [itself] of the privilege of conducting activities in" the N.D. Cal. or that it "purposefully directed its activities toward" the N.D. Cal. *Pebble Beach*, 453 F.3d at 1155. "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections

of the laws in the forum" while "[e]vidence of direction generally consists of action taking place outside the forum that is directed at the forum." *Id*. WDYKA's CEO Lee Blaylock expressly disclaimed having taken any action directed at any residents of California, much less residents residing in the N.D. Cal. Ex. C, Blaylock dep. at 19:19-24, 20:22-25. He did not perform any advertising activities designed to encourage California residents to use the WhoAt product. *Id.* at 20:22-25. LinkedIn cites the fact that WDYKA maintained an "interactive" website that was accessible from within the N.D. Cal. This overstates the WDYKA website, which was not interactive unless WDYKA specifically provided the user with access, which it did on an individual basis via email. Ex. C, dep. at 16:1-14. Mr. Blaylock also explained:

> Q. So the WhoDoYouKnowAt.com web site was not used by WhoDoYouKnowAt to interact with its customers?
> A. What do you mean by interact?
> Q. Setting aside the e-mail discussions that you mentioned, I'm talking about a user coming on to WhoDoYouKnowAt.com and communicating with employees of WhoDoYouKnowAt.
> A. No. Other than -- we had no chat or anything support. I think everything would have been via e-mail, and that -- in that definition of interaction, yes, it would just be e-mail. (*Id*. at 21:21-22:7)

Also, of the 2,000-3,000 registered users of the WhoAt product, only 1 or 2 users – who were simply friends of Lee Blaylock – resided anywhere in California. Neither paid for access to the WhoAt product. *Id.* at 46:19-47:2. Tellingly, at his deposition, LinkedIn chose specifically to avoid asking Mr. Blaylock whether either of these California friends of his lived in the Northern District of California. Hence, <u>there is no record evidence to suggest that WDYKA has ever had a single contact with any user in the Northern District of California</u>. *See* 28 U.S.C. § 1391(c) ("For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any *judicial district* in which it is subject to personal jurisdiction at the time the action is commenced."). LinkedIn has failed its burden.

As the Ninth Circuit has aptly summarized, to satisfy the first prong of the jurisdictional test a defendant "must have (1) committed an intentional act, which was (2) expressly aimed at

1610776v1/012151

8

the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Pebble Beach*, 453 F.3d at 1156. "[S]omething more" is needed in addition to a mere foreseeable effect in the forum" and "the determinative question is whether [WDYKA's] actions were 'something more'- precisely, whether its conduct was expressly aimed at [the forum] .. ." *Id*. This evidence is wholly lacking here. Perhaps for this reason, LinkedIn makes no mention of this test whatsoever.

Instead LinkedIn tells this Court that WDYKA is subject to personal jurisdiction in the Northern District of California because it filled out a Facebook and a LinkedIn profile. So did the 750,000,000 users of Facebook and the 100,000,000 users of LinkedIn. Yet, no one would seriously contend this subjects them to jurisdiction in the N.D. Cal., and no case holds as much. The only case LinkedIn cites for purportedly similar facts, an unpublished memorandum in *Adobe Systems v. Childers*, in fact supports the opposite conclusion.

The unpublished *Adobe Systems* case did not hold that a website accessible in California plus a company profile on Facebook or LinkedIn equals personal jurisdiction. Rather, that case took pains to identify <u>all of the additional contacts</u> beyond the defendant's website and its postings on Facebook/LinkedIn as well as Twitter and YouTube, including the following significant facts: the defendant used a California payment processing company to process the precise purchases at issue in the lawsuit, and the defendant entered into a reseller agreement with the plaintiff, which expressly provided that "any dispute would be litigated in the Northern District of California." *Adobe Sys. v. Childers*, 2011 WL 566812, at *4 (unpublished). Moreover, rather than merely filling out a Facebook or LinkedIn profile, the defendant in *Adobe Systems* affirmatively advertised "its 'close relationship' with California firms" and these representations were at the heart of the dispute between the parties. *Id*. at *5.

In addition, the *Adobe Systems* court described an "interactive website," not as LinkedIn casually uses it here, but as one which allows consumers to "interact with [defendant's] sales

representatives through live chats." *Id*. By contrast, WDYKA's website was designed to be far more passive – Blaylock disclaimed any live chat capability (Ex. C, at 22:4) and access to the actual infringing product was granted separately via email. "Numerous courts have held that a defendant's operation of a passive website containing allegedly infringing material is insufficient to show that venue is proper in a given jurisdiction." *Adobe Sys.*, 2011 WL at *8 & n.5; *see also Shari's Berries Int'l, Inc. v. Mansonhing*, No. 02:06-cv-0768-GEB-GGH, 2006 WL 2382263, at *2 (E.D.Cal. Aug. 17, 2006) (finding venue improper where the defendant operated a "passive" website containing a toll-free number and an e-mail address that did not allow customers to place online orders or engage in transactions with the defendant), *Dakota Beef L.L.C. v. Pigors*, 445 F.Supp.2d 917, 920-21 (N.D.Ill.2006) (finding venue improper where the defendant operated a website equipped to take orders and which advertised products with allegedly infringing marks because "only two orders were received, none were filled, and none were shipped to the district"), and *Jamba Juice Co. v. Jamba Group, Inc.*, No. C-01-4846 VRW, 2002 WL 1034040, at *2 (N.D.Cal.2002) (finding venue improper in a trademark infringement action where the only allegation was that the defendant operated a website that was accessible in the district, which was the plaintiff's principle place of business, because to find venue proper would "be to adopt a rule that would subject any corporation with a website to venue in the district in which plaintiff does business ... [a rule] that would dramatically alter the present venue statute").

Finally, the *Adobe* case emphasizes that LinkedIn must show that WDYKA "<u>knew that its actions would cause harm in this district</u> [the N.D. Cal.]." *Id*. at *4. LinkedIn has not even established that WDYKA actually granted access to anyone in the N.D. Cal., much less shown that WDYKA *knew* its actions would cause harm there. *See id*. at *8 (citing *Jamba Juice Co.*, 2002 U.S. Dist LEXIS 9459, at *7 (looking to the Ninth Circuit's holding that "in order to establish personal jurisdiction, a plaintiff must show 'something more' than the operation of a general access website, specifically, 'conduct directly targeting the forum' "); Ex. C, Blaylock

dep., at 20:22-25 ("Q. Did you ever take any steps to advertise on the web with the intention that it would be viewed by California customers? A. No, not specifically.")

The *Adobe* court also cited with approval – and went to great lengths to distinguish the facts of – another case, the *Dakota Beef* case, which bears remarkable similarity to the facts here. In *Dakota Beef v. Pigors*, 445 F.Supp.2d 917 (N.D.Ill.2006), the court found that venue in a trademark suit against a South Dakota beef producer was not proper despite the presence of a website that could take orders from customers within the district, because "the defendant offered affirmative evidence that only two orders were received from the website, no orders were actually fulfilled, and no orders ever were shipped to Illinois." *Adobe*, 2011 WL 566812 at *8. Similarly here, at the very most only 2 California residents requested access to WhoAt – both were simply friends of CEO Lee Blaylock, and neither paid for access. There is no evidence that either person ever used the product, or even lives in the N.D. Cal. The *Adobe* court took pains to explain that the facts it was considering differed from *Dakota Beef* because the defendant "has numerous contracts with Northern California software companies, service providers, and advertisers," its website was "both active and widely promoted," and the defendant "prominent[ly] display[ed]" a "'close relationship' with these local [California] companies" that formed the basis for the trademark infringement lawsuit. Not one of these distinguishing facts exists here. To the contrary, WDYKA's CEO has specifically disclaimed having a "close relationship" with Facebook or Linkedin, disclaimed having "numerous contracts with companies in California," and testified it would be inaccurate to characterize WDYKA's site as "active and widely promoted." Ex. C., Blaylock dep., at 38:12-21. **This is the *Dakota Beef* case, plain and simple.** And *Adobe* shows that California courts will follow *Dakota Beef*.

*Second*, even if LinkedIn had cited evidence to support the first prong, jurisdiction would still be improper under the second – because the claim here does not arise from WDYKA's activities in California. To answer this prong, "the Ninth Circuit follows the 'but for' test."

*Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007). LinkedIn must show that plaintiffs "would not have suffered an injury 'but for' [WDYKA's] forum-related conduct." *Id*. The opposite is true here – as the injury plaintiffs' have suffered occurred separately from and irrespective of WDYKA's minor California activities (its profiles on Facebook/LinkedIn and the CEO's two non-paying California friends who may not even live in the N.D. Cal.). LinkedIn's motion fails for this reason alone, as all three prongs must be satisfied.

***Third***, the exercise of jurisdiction against WDYKA in California is not reasonable. WDYKA's CEO testified that traveling to California to litigate this case would be a significant burden. Its counsel is located in Dallas. Ex. C, at 38:6-11. In a similar case, a California court dismissed for lack of personal jurisdiction, explaining "even if the [defendant] had sufficient contacts to establish personal jurisdiction, exercising that jurisdiction would be particularly unreasonable in light of the burden placed on the [defendant]." *Pacific Life Ins. Co. v. Spurgeon*, 319 F.Supp.2d 1108, 114-15 (C.D. Cal. 2004). The same result would ensue here.

In sum, Linked has failed to establish that any one of the three jurisdictional prongs – much less all of them – are satisfied here. Its motion must be denied for this reason alone.

**II.     In Addition to Possessing Jurisdiction Which the N.D. Cal. Lacks, This District is the Most Convenient Forum When ALL Parties Are Considered.**

Because LinkedIn has not shown this case could have been brought in the transferee district, the Court should not reach the question of whether this is the most convenient forum. Nonetheless, LinkedIn has equally failed to show, as it must, "good cause," for transfer – a burden which is only satisfied if LinkedIn "demonstrates that the transferee venue is <u>clearly more convenient</u>." *Volkswagen II*, 545 F.3d at 314. LinkedIn largely ignores WDYKA in its analysis of convenience, instead resting on sharp rhetoric and assertions that LinkedIn is the only "real" defendant. LinkedIn cites no case that would permit the Court to disregard WDYKA when analyzing the § 1404(a) factors. LinkedIn has failed to meet its heavy burden here.

### A. The Private Interest Factors Weigh Against Transfer.

Each of the private interest factors are either neutral or weigh against transfer:

**(1) Relative Ease of Access to Sources of Proof:** The evidence related to WDYKA will be located in Texas, at the Dallas office of WDYKA, at the Dallas offices of NITT Technologies (which performed technical work on the product, see Ex. L), at the Austin-based office of ReachForce which housed the servers for the website (Ex. C, at 5:25-6:12; 29:22-31:1), and with the former employees and customers of WDYKA, which are concentrated in and around Dallas, including within this district. See Ex. G (Whitepaper re Dallas customer success); Ex. C at 26:18-21. Because of Mr. Blaylock's testimony that he lost many files related to WDYKA in a recent computer crash (see Ex. C, at 33:21-15) it is expected that evidence relating to WDYKA will come largely from witness testimony and the files of third parties.

WDYKA's former Chief Operating Officer, Leon Campise, lives in this district (Exs. U-V), and is expected to have knowledge of the operation of WhoAt, since he helped to design it from a conceptual level, as well as the business development, past revenues and future plans of WDYKA. Ex. C, at 25:14-26:21. Afsheen Ali performed marketing for WDYKA and resides near this district, in Dallas. She is expected to be familiar with the identity of WDYKA's customers, its marketing and revenues, its publications (since she drafted the Whitepaper attached as Ex. G), and WDYKA's future plans. Ex. C, at 28:16-29:2. Ken Troupe interfaced directly with WDYKA customers, and resides in the Dallas area; he is expected to have knowledge of WDYKA's sales efforts, commercialization and future plans. Ex. C, at 25:1-13. Bob Riazzi and another individual identified as the "VP of Sales or VP of marketing" at ReachForce, out of Austin, Texas, are expected to have knowledge of WDYKA's website traffic, since ReachForce helped to host the servers. They are also expected to have knowledge of WDYKA's commercialization and future plans, because Mr. Blaylock testified that he was working with ReachForce on a deal related to WDYKA until a few months ago. Ex. C, at 29:22-

32:4. Gaurav Khandelwal, from the Dallas area, was a software engineer for NIIT Technologies working on the WDYKA account. Ex. L. He is expected to have knowledge of the technical operation of WhoAt and the relationship with NIIT Technologies. The files of each of these individuals are expected to be located in Dallas and Austin. This factor weighs against transfer.

(2) **Availability of Compulsory Process:** LinkedIn's motion fails to identify a single unwilling witness residing within the subpoena power of the N.D. Cal. See Motion, at 8. LinkedIn says that its outside lawyers and former CEO attempted to purchase the patents from plaintiffs prior to this lawsuit, but fails to explain why either is unwilling to testify now. The US Supreme Court and this Court have declined to assume that all third parties are "unwilling" and therefore relevant in the venue analysis. *Texas Data Co., L.L.C. v. Target Brands, Inc.*, --- F.Supp.2d ----, 2011 WL 98283, *10 (E.D. Tex. 2011) ("the history of this factor shows it also was based on whether a witness would willingly or voluntarily appear") (quoting *Piper v. Reyno*, 454 U.S. 235, 241 (1981) ("availability of compulsory process for attendance of <u>unwilling</u> ....").

By contrast, this Court does possess absolute subpoena power over WDYKA's former Chief Operating Officer, Leon Campise, as shown in Ex. N. As a former employee of a defendant, he is expected to be unwilling to appear voluntarily for plaintiffs. The topics he is expected to testify about are set forth in section (1) above. This factor weighs against transfer.

(3) **Cost of Attendance for Willing Witnesses:** LinkedIn lists a number of "prior art" witnesses, without identifying a single item of prior art by name or a single witness's address. Nonetheless, LinkedIn will undoubtedly offer to reimburse any prior art/invalidity witnesses it actually calls for their travel costs. The witnesses associated with WDYKA will, however, feel the cost of attendance most acutely. There are at least 7 WDYKA witnesses, mostly in and around Dallas, expected to testify as set forth in section (1) above – all of whom will have to fly (as opposed to drive) to hearings and trial if the case is moved. CEO Lee Blaylock testified this

would impose a burden on WDYKA and that it would be more convenient to hold trial in the Eastern District of Texas. Ex. C, at 38:6-11. This weighs against transfer.

### B. The Public Interest Factors Weigh Against Transfer.

Each of the public interest factors are either neutral or weigh against transfer.

**(1)** **Court Congestion:** The median time to trial for civil cases in the N.D. Cal. is 20.3 months versus 24 months in this District. Exs. O & P. This factor is thus neutral.

**(2)** **Local Interest**: WDYKA is a Texas company, whose customers and former employees live in and around this district. It did business with other Texas companies in the Dallas area. Ex. G. It plans to continue to do business with customers in Texas with a new product in the same business space as the WhoAt product currently accused of infringement. This alone provides a substantial local interest in hearing this dispute. LinkedIn has also partnered with Texas companies to launch a new infringing product, Ex. Q, it has employees in Texas by its own admission, and is reportedly expanding its Texas presence by hiring more employees as we speak. Ex. R (Screen prints showing two active job openings at LinkedIn Dallas, and LinkedIn's Dallas employee twitter feed: "LinkedIn is looking for a dynamic sales person to join my efforts in the Southwest. Let us know if you're interested!"). This factor weighs against transfer.

Finally, the last two factors – the familiarity with the governing law and avoidance of conflict of laws – are neutral. With all factors either neutral or weighing against transfer, LinkedIn has not met its burden of showing that the Northern District of California is "clearly more convenient." Accordingly, its motion should be denied.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny defendant LinkedIn Corporation's Motion to Transfer Venue to the Northern District of California.

        SUSMAN GODFREY, L.L.P.

        */s/ Lexie White*
        Lexie White
        State Bar No. 24048876
        S.D. Bar No. 618078
        1000 Louisiana Street, Suite 5100
        Houston, Texas 77002
        Telephone: (713) 651-9366
        Facsimile: (713) 654-6666

        *Lead-Attorney for Plaintiff*

Eric Mayer
State Bar No. 13274675
SD Bar No. 09698
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

      I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this 11th day of July, 2011, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

                                              */s/Lexie White*
                                              Lexie White